**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1) PLANT BASED FOODS ASSOCIATION, and ) | |
| 2) TURTLE ISLAND FOODS SPC d/b/a THE TOFURKY COMPANY, ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | |
| ) | Case No. CIV-20-938-F |
| 1) KEVIN STITT, in his official capacity as Oklahoma Governor, and ) | |
| 2) BLAYNE ARTHUR, in her official capacity as Oklahoma Commissioner of Agriculture, ) | |
| ) | |
| *Defendants.* ) | |

**AMENDED COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

Plaintiffs Turtle Island Foods d/b/a the Tofurky Company and the Plant Based Foods Association (PBFA) bring this suit under the dormant Commerce Clause, the Due Process Clause, and the Supremacy Clause of the Constitution because Oklahoma's Meat Consumer Protection Act (the Act) institutes a protectionist trade barrier that contravenes and is preempted by federal law and imposes vague standards on Tofurky and other PBFA members who use words associated with meat products to describe products that are clearly marketed and packaged as 100% plant-based/vegan.

**INTRODUCTION**

1.      Plant-based meats are foods that approximate the texture, flavor, and appearance of meat from animals. Plant-based meats are typically made from soy, tempeh,

wheat, jackfruit, textured vegetable protein, or other vegan ingredients. Countless varieties of plant-based meats are currently available in grocery stores, restaurants, and from other retailers in Oklahoma.

2.      Plant-based meat producers rely on their ability to differentiate their products from animal-based meat products. They convey to consumers that their products contain no animal-derived ingredients in a variety of different ways. For example, they may prominently display a "certified plant-based" or vegan seal; they may use terms like "veggie" or "vegetarian" alongside words like "sausage" (*e.g.*, "veggie sausage"); they may display "veggie"-type qualifiers elsewhere on the front of package in a prominent position; they may fancifully misspell meat terminology like "chik'n" or "pep'roni"; or they may employ a combination of these methods. See Illustration 1 below for examples.

3.      Like all other food companies, plant-based meat producers must comply with the federal Food, Drug and Cosmetic Act's (FDCA) provision that prohibits any marketing or packaging that is "false or misleading in any particular,"[1] as well as FDCA requirements governing the names of products—*i.e.*, that the common or usual name of the product (or "statement of identity") must be truthful and not misleading and may be established by common usage.[2] To date, there is no evidence that consumers are confused by plant-based meat producers' marketing, packaging, or naming conventions.

---

[1] 21 U.S.C. § 343(a).

[2] 21 C.F.R. §§ 102.5 and 101.3.

4.      Despite this, the Act attempts to implement additional burdensome, impractical, and unclear disclosure requirements on plant-based meat producers that go beyond federal law and create a patchwork of requirements—making the sale of plant-based products impracticable or impossible on a nationwide basis.

5.      The Act expressly prohibits advertising "a product as meat that is not derived from harvested production livestock," but it allows that "product packaging for plant-based items shall not be considered in violation of [the Act] so long as the packaging displays that the product is derived from plant-based sources in type that is uniform in size and prominence to the name of the product." In other words, the Act forbids plant-based meat producers from using meat terms unless they include a disclaimer on their product labels in the same type size and prominence to the "name of the product" that their plant-based products are not actually meat derived from animals.

6.      Compliance with the Act would require Tofurky and other PBFA members to fundamentally redesign each product label and corresponding marketing materials. And because of the Act's vague language, plant-based producers have no way of knowing how to comply with the law. Plant-based meat producers across the country, including Tofurky and other PBFA members, would be forced to spend millions of dollars to develop Oklahoma-specific labels or abandon the Oklahoma market altogether; lose the ability to freely, flexibly, and truthfully label their products; and they may *still* run afoul of the Act. Thanks to the Act, companies also lose the current safe harbor that compliance with the FDCA's nationally uniform labeling scheme currently provides. These harms resulting from the Act, which are borne primarily by out-of-state businesses, are not justified by any

3

legitimate local interest.

7.     The Act suppresses innovation, impedes the free flow of commerce, and creates a patchwork of standards that threaten to preclude nationwide sales for plant-based meat producers. Yet despite its severely detrimental effects, the Act provides no benefit to Oklahoma consumers; it only benefits Oklahoma's meat producers.

8.     The Act is also either redundant, or in conflict, with existing federal law. To the extent it requires labeling different from or in addition to that required by the FDCA's standards governing the names of food products, it is preempted by the FDCA.

9.     Finally, the Act's language is unclear and vague.

10.    By attempting to impose burdensome roadblocks on a burgeoning industry, the State of Oklahoma has bowed to pressure from cattle industry lobbyists and taken sides in a heated national campaign by proponents of animal-based foods against plant-based products. The growing consumer demand for plant-based alternatives has caused conventional meat producers to increasingly view plant-based meat producers as a threat. Their lobbyists have responded by pressuring legislators and regulators (including Oklahoma's) to undermine the ability of plant-based producers to market their products. Arkansas, for example, recently passed a law to prevent plant-based companies from using words like "meat" to describe their products—an effort that was recently enjoined by a federal court under the First Amendment.

11.    Oklahoma has now added to this patchwork of protectionist state laws. Oklahoma's Act attempts to force PBFA members, including Tofurky, to make wholesale changes that would prevent them from communicating the nature and contents of their

products in a way that complies with federal law, and cost millions of dollars in packaging changes alone. The Act has already burdened plant-based meat producers and has significantly obstructed their ability to do business in the state. The Act violates the Supremacy Clause, the Due Process Clause of the Fourteenth Amendment, and the dormant Commerce Clause. PBFA and Tofurky accordingly seek injunctive and declaratory relief to safeguard the right to label products in accordance with federal law without fear of enforcement or reprisal by the State. In support of their request, Plaintiffs assert the following:

## JURISDICTION AND VENUE

12.     This action arises under the Constitution of the United States and 42 U.S.C. § 1983. The jurisdiction of this court is invoked under 28 U.S.C. §§ 1331 and 1343(a).

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims in this complaint occurred in Oklahoma City, within this judicial district.

## PARTIES

*Plaintiffs*

14.     Plaintiff the Plant Based Foods Association is a nonprofit trade association that represents the leading manufacturers and sellers of 100% plant-based foods, including plant-based meat producers. PBFA is incorporated in the State of California and headquartered in Oakland, California.

15.     PBFA was founded in 2016 to build a strong foundation for the plant-based foods industry to succeed and thrive, and for innovative food companies to have a

collective voice in the policy arena and marketplace. PBFA has more than 300 company, affiliate, and investor members who represent the unified voice of the plant-based foods industry. Of its 200+ company-members, at least 92 members manufacture and sell plant-based meat alternatives like veggie burgers, vegan chicken nuggets, and plant-based sausages.

16.     PBFA's goal is to promote clarity and consistency in the labeling of plant-based foods. To that end, PBFA has developed comprehensive voluntary standards for the labeling of plant-based meat alternatives such as plant-based sausages and burgers. PBFA's standards provide guidance to its industry members about how to label plant-based products in a way that is consistent and clear for consumers. PBFA recommends that companies use qualifying language like "vegan," or "plant-based," when they use terms like "sausage," "chicken," "nuggets," or "burger" to indicate to consumers that the products do not contain animal-derived ingredients. To illustrate: "plant-based chicken nuggets" indicates to consumers that the chicken nuggets contain 100% plant-based ingredients and contain no animal-derived ingredients.

17.     Part of PBFA's work has involved communicating with state legislators about the deleterious effects of protectionist and anti-free market labeling laws that are designed to undermine plant-based meat producers.

18.     Plaintiff Tofurky develops, produces, markets, and sells a popular line of 100% plant-based meat products including vegan burgers, meat slices, and sausages in various flavors. Tofurky's products are marketed and sold nationwide, including throughout Oklahoma.

19.     Tofurky is a certified B Corporation, which means that the company is meeting the highest standards of social and environmental performance, public transparency, and legal accountability.

20.     Family owned and operated since 1980, Tofurky is a mission-based company whose aim is to make great food everyone can enjoy, and to do it with respect for people, animals, and the planet. Tofurky's target market is people who want to *avoid* meat made from animals. To that end, its products are all prominently marketed and packaged as vegan and 100% plant-based, with labels that unmistakably convey that they are "PLANT-BASED."

21.     Tofurky invests significant resources to ensure its products are labeled in compliance with applicable state and federal laws across the country. This includes the prevailing law that governs food companies' labels, the federal Food, Drug and Cosmetic Act. Due to the FDCA's express preemption provision, which prevents states from passing labeling requirements different from or in addition to certain FDCA provisions, Tofurky can usually count on the fact that, if its labels comply with the FDCA, they comply with state requirements, too. As a result of this assurance, Tofurky and other companies are able to invest significantly and engage in federally accepted marketing and packaging practices nationwide.

*Defendants*

22.     Defendant Kevin Stitt is the Governor of Oklahoma and as such, has direct authority over executive branch personnel and the officers charged with enforcing the Act.

23.     Defendant Blayne Arthur is the Oklahoma Commissioner of Agriculture.

Commissioner Arthur heads the agency tasked with enforcing the Act.

## FACTUAL ALLEGATIONS

### *PBFA members, including Tofurky, market clearly labeled plant-based foods.*

24.     All PBFA company-members manufacture or sell one or more 100% plant-based food product. Founded in 2016 by member companies including Tofurky, PBFA has worked tirelessly to ensure its members engage in transparent marketing and labeling practices while facing fair policies and can compete on a level playing field with other food companies, including animal-based meat companies.

25.     Tofurky follows PBFA's voluntary guidelines and is representative of other PBFA members who sell plant-based meat products. To wit, Tofurky prominently markets its products as vegan and plant-based. Tofurky's labels and marketing materials unmistakably convey to the public that the foods are made using exclusively ingredients that do not involve animals, using prominent language like: "**Made From Plants**," and "**plant-based**," and "veggie" or "vegetarian."

26.     Tofurky produces its plant-based meats using natural processes and high-quality ingredients that include organic tofu and whole soybeans sourced from organic, non-GMO growers. They are high-quality products that prominently highlight the fact that they are plant-based and typically sell for a higher price-point than animal-based meat counterparts.

27.     Today, Tofurky products are sold in approximately 15,000 stores across the country. Sales are booming—the company grew 22% in the past year—and Tofurky sells at several stores throughout Oklahoma including Homeland, Whole Foods, Target, Sprouts

Farmers Market, Walmart, Reasors, and Akins Natural Foods. Tofurky continuously innovates new products—including developing a new line of veggie burgers in 2021. Again, all of Tofurky's products are clearly marketed and labeled as "plant-based," or "vegan," and no consumer would mistakenly buy these products thinking they were meat from slaughtered animals.

28.     Tofurky products include plant-based chick'n, (including lightly seasoned style, Thai basil, sesame garlic, and barbecue), plant-based deli slices (including smoked ham style, peppered, bologna style, hickory smoked, and oven roasted), a plant-based burger, plant-based artisan sausage (including spinach pesto, andouille, Italian, kielbasa, and beer brats), plant-based crumbles (including chorizo style and beef style), plant-based pockets (including ham and ched'ar, turk'y broccoli ched'ar, and pepp'roni pizza), tempeh (including smoky maple bacon, sesame garlic, organic five grain, and original soy cake), and plant-based roasts (including ham style and roast style).

**Illustration 1: Examples of Tofurky products and marketing**

 















29.    Tofurky's business model relies entirely on consumers who are seeking plant-based alternatives being able to clearly distinguish its products from animal-based meat products. Consumers choose Tofurky's products because they are increasingly aware of how their food choices affect the environment, animal welfare, and their own health.[3] And studies show that the vast majority of consumers are often willing to pay more for plant-based meat than animal-based meat.[4] Being plant-based is a feature of these products,

---

[3] *See* DSM Food Specialties, *Consumer Insights Report: Plant Power: What's Behind the Market Growth for Plant-based Foods?*, *available for download at* https://www.dsm.com/content/dam/dsm/food-specialties/en_us/documents/insights-series-plant-power-2019-leaflet.pdf; *see also* Edlong, *Connecting with Consumers in Plant-based Dairy*, Food Dive (Nov. 19, 2019), https://www.fooddive.com/spons/connecting-with-consumers-in-plant-based-dairy/567437/ (last visited Oct. 18, 2021).

[4] Moonshot Collaborative, Plant-Based Shopper Profile, *available at* http://moonshotcollaborative.com/wp-content/uploads/2020/11/Cultivate-PB-Consumer-

not something producers are trying to hide. When consumers buy plant-based meat alternatives, they are not accidentally purchasing cheaper, lower-quality products—quite the opposite. Correspondingly, producers of plant-based meat alternatives do not want their products to be mistaken for animal-based counterparts, lest their products lose their primary appeal—that they are not from animals.

*Consumers are not confused by plant-based meat products.*

30.   Consumers need truthful and non-misleading information about the nature and use of food products they buy in order to make informed purchasing decisions. For decades, plant-based producers have used terms like "vegan sausage," "plant-based bacon," and "veggie burger" to convey to consumers the nature and contents of their products. In the decades that plant-based meats have been in grocery stores, there has been no evidence that consumers are confused by these products. Correspondingly, the FDA has never taken enforcement action for the statements of identity used by plant-based meats.

31.   Instead, the FDA has long-accepted the naming and labeling conventions of plant-based meat products. The FDA has perhaps accepted these statements of identity because these product names provide consumers with the most accurate information about the flavor, consistency, and uses for plant-based meat products. In fact, these naming conventions are so well-understood and established that the FDA itself uses them.[5]

---

Profile.pdf (93% of plant-based buyers who are motivated for animal welfare reasons would pay up, with sustainability-related concerns following closely behind at 86% and health reasons at 85%).

[5] FDA FINAL RULE ADDING SOY LEGHEMOGLOBIN TO LIST OF COLOR ADDITIVES EXEMPT FROM CERTIFICATION (calling ground beef analogue products "veggie burgers"), *available at* https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-

32.     As discussed above, plant-based meat products' sales depend on their ability to differentiate themselves from animal-based meat for consumers who are seeking *alternatives* to animal-based meat. So common sense dictates that plant-based meat producers use marketing and packaging for these products that clearly identify them as *plant-* rather than *animal-*based for consumers. And the way companies currently label plant-based meat products effectively ensures consumers get what they expect when purchasing these foods. In short, companies are trying to avoid misleading consumers, while still using terms that consumers understand and that convey the texture, flavor, and function of their plant-based meat products.

33.     In addition, there have been no consumer-led actions brought against plant-based meat producers alleging they have been misled by these products. However, courts *have* recognized that similar labeling conventions using qualifying language in addition to animal-based terms like "milk" are not likely to mislead reasonable consumers (*e.g.*, "vegan butter" and "almond milk.").

34.     Federal courts have recognized that the likelihood of these types of names causing any consumer confusion is "highly improbable" and "stretches the bounds of

---

effective-date-final-rule-adding-soy-leghemoglobin-list-color-additives-exempt (last visited Aug. 10, 2021); FDA GUIDANCE FOR INDUSTRY: REFERENCE AMOUNTS CUSTOMARILY CONSUMED, Feb. 2018, *available for download at* https://www.fda.gov/media/102587/download (examples of products named by the FDA include "meatless Salisbury steak with gravy," "soy burger," "meatless scallop," "meatless salami," "vegetarian pate," and "vegetarian slices" to name a few).

credulity."[6] The Ninth Circuit used similar naming conventions as Tofurky's to deride consumers' claims of supposed confusion, saying that "[u]nder the same logic, consumers would also have to 'believe that veggie bacon contains pork, that flourless chocolate cake contains flour, or that e-books are made out of paper.'"[7]

35.    Moreover, a California district court recently found that the California Department of Food and Agriculture's attempt to prevent vegan dairy producers from calling products "vegan butter" was unconstitutional,[8] in part because consumers are not confused by these types of product names. In short, several courts have determined that consumers readily understand the current labeling conventions and names of plant-based products.

36.    This sound conclusion has been borne out by empirical studies. A recent empirical study by Cornell tested consumer reactions to "Plant-Based Deli Slices: Bologna Style," one of the exact naming conventions employed by Tofurky. Results showed that consumers understand that the products did not come from animals. The study also found that plant-based producers' use of "meat" terminology actually *improves* consumer understanding of these types of products. Jareb A. Gleckel, *Are Consumers Really*

---

[6] *Ang v. Whitewave Foods Co.*, No. 13-CV-1953, 2013 WL 6492353, at *4 (N.D. Cal. Dec. 10, 2013). *See also Gitson v. Trader Joe's Company*, No. 13-cv-011333, 2015 WL 9121232, at *1 (N.D. Cal. Dec. 2, 2015).

[7] *Painter v. Blue Diamond Growers,* No. CV 17-02235, 2017 WL 4766510, at *2 (C.D. Cal. May 24, 2017), *aff'd*, 757 F. App'x 517 (9th Cir. 2018) (rejecting as "implausible" the claim that almond milk was mislabeled under federal law).

[8] *Miyoko's Kitchen v. Ross*, Case No. 20-cv-00893-RS, 2021 WL 4497867 (N.D. Cal. Aug. 10, 2021).

*Confused by Plant-Based Food Labels? An Empirical Study*, J. of Animal & Envtl. Law, Vol. 12, No. 2 (Spring 2021).

37.     As mentioned above, PBFA supports these uniform labeling standards that comply with the FDCA and truthfully convey the nature and contents of plant-based meats to consumers. The organization, in conjunction with Linkage Research and Consulting, also worked to examine public comments to the FDA regarding these types of naming conventions when used for plant-based dairy products. In reviewing these comments, PBFA found that 76% of consumers support the current labeling conventions used by plant-based products (with half of the 13.5% of opponents to plant-based dairy naming conventions self-identifying as dairy farmers).[9] Adding to this, because all existing data demonstrate that consumers understand the labels of plant-based meat products, researchers have opined that state-mandated changes to labeling conventions may actually *create* consumer confusion where none previously existed.

38.     Tofurky's labels and marketing materials all clearly indicate its products are meat substitutes that are plant-based and vegan and, thus, are entirely truthful. There is no evidence of consumer confusion about the ingredients or source of any of Tofurky's foods.

39.     The Act attempts to curtail the flexibility of plant-based meat producers' marketing and labeling, all of whom are located outside of Oklahoma, and whose activities occur outside of the state. This Act commercially harms the plant-based meat industry—

---

[9] PBFA WEBSITE, MORE THAN 75% OF COMMENTERS TELL FDA: ALLOW PLANT-BASED ALTERNATIVES TO USE DAIRY TERMS, (Apr. 22, 2019) *available at* https://www.plantbasedfoods.org/commenters-tell-fda-allow-plant-based-alternatives-to-use-dairy-terms/ (last visited Oct. 7, 2021)

effectively making nationwide sales of plant-based meats impossible—and in turn, protects conventional meat producers from competition.

40.    In other words, the Act confers a clear competitive advantage to in-state animal-based meat producers and creates a competitive disadvantage for plant-based meat producers, none of which are in Oklahoma. The effect of the law will be that local animal-based meat products will constitute a larger share, and plant-based meats with an out-of-state source will contribute a smaller share, of total sales within Oklahoma.

### *Existing law already prevents actually misleading or deceptive labeling.*

41.    Federal and state laws have long prohibited any misrepresentations in the marketing or packaging of food products.

42.    Plant-based meat labels fall within the federal Food and Drug Administration's jurisdiction under the FDCA. The FDCA categorizes a food product as "misbranded" if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1). The FDA has not brought any reported enforcement actions for the misleading use of "meat" or related terms to describe plant-based meats on food labels or marketing materials.

43.    In addition, the Federal Trade Commission (FTC) enforces the Federal Trade Commission Act (FTCA). See 15 U.S.C. § 45 (prohibiting "unfair or deceptive acts or practices" in or affecting commerce). The FTCA's prohibition on "unfair or deceptive acts or practices" encompasses food marketing. The FTC, along with the FDA, has concurrent jurisdiction with respect to food products marketed to consumers. But the FTC regulates the marketing and advertising of food products to prevent consumer confusion and to

ensure that products are accurately marketed.

44.     In other words, the FTC already has authority to ensure that plant-based meat products are marketed honestly and that consumers are adequately informed. Yet it has not brought any reported enforcement actions for the use of "meat" or related terms to describe plant-based on food labels or marketing materials.

45.     Oklahoma's Public Health and Safety Code prohibits "false or misleading" labeling of food products. Okla. Stat. tit. 63, § 1-1110(a).

46.     Similarly, Oklahoma's Consumer Protection Act prohibits "false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services." Okla. Stat. tit. 15, § 753(5).

47.     On information and belief, there have been no cases in Oklahoma (or any other state) holding that it is false or misleading to use the word "meat," or related terms, on labels and marketing materials for plant-based meats.

*The Act is either duplicative of or in contradiction with existing federal law.*

48.     In addition to the FDCA provision prohibiting any false or misleading labeling, plant-based meat producers are also governed by FDCA provisions surrounding the names of products.

49.     The FDCA, as amended by the Nutrition Labeling and Education Act (NLEA), is intended to promote "national uniformity in certain aspects of food labeling, so that the food industry can market its products efficiently in all 50 States in a cost-

effective manner."[10]

50.     Because of the importance of ensuring a nationwide uniform labeling scheme, especially when it comes to the label on the front of a food package, known as the Principal Display Panel (PDP), Congress built an express preemption provision into the FDCA, in order to preempt "some state laws that interfered with [companies'] ability to do business in all 50 states."[11] The intent of Congress was clear: To "provide national uniformity where it is most necessary."[12] And of course the Supremacy Clause of the Constitution, U.S. const. art VI cl. 2, allows federal law to preempt state law. A state law is expressly preempted when a congressional statute or federal agency regulation contains explicit language stating that it supersedes that state law.

51.     The discrete provisions addressed at 21 U.S.C. § 343-1(a) carefully limit the subjects on which federal standards will preclude enforcement of non-identical state laws, and specifically include much of the required information and common representations companies make on food products' PDPs. This includes those requirements governing products' common names—or in FDA parlance—"statements of identity."[13]

52.     Regulations surrounding statements of identity require that the statement of

---

[10] State Petitions Requesting Exemption from Federal Preemption, 58 Fed. Reg. 2462, 2462 (Jan. 6, 1993) (codified at 21 C.F.R. pt. 100).

[11] 136 Cong. Rec. H12951-02, H12954 (Oct. 26, 1990) (explanation of FDCA's preemption provision by Representative Waxman).

[12] 136 Cong. Rec. at S16609 (Sen. Mitchell); *see also* 135 Cong. Rec. at S16611 (Sen. Hatch).

[13] 21 U.S.C. § 343-1(a)(1).

identity, or "common or usual name," is included once on the PDP. The FDCA also governs the prominence with which producers must include statements of identity on products' Principal Display Panels.

53.     Paragraph 3 of the express preemption provision provides that states may not impose any non-identical "requirement for the labeling of food of the type required by" section 343(i)(1). That provision provides that a food label must bear the common or usual name of the food. Because Tofurky and PBFA member-companies names comply with section 343(i)(1) and related regulations, any additional or non-identical state requirements are preempted by the FDCA. Thus, under the FDCA, a state law governing the "common or usual" product name is expressly preempted.

54.     Oklahoma's Act either requires companies to modify the placement and prominence of FDCA-compliant common or usual names, or requires them to place additional product names, on their PDPs. Because the FDCA expressly lays out the requirements for statements of identity, the Act imposes obligations on companies that are different from, or in addition to, those laid out by the FDCA.

55.     Uniform standards for labeling, including those governing statements of identities, allow plant-based meat companies to do business across state lines without unfair (and likely impossible) impediments. The cost to allow otherwise, both in terms of financial and human resources and harm to budding companies' bottom lines and goodwill, would be astronomical.

*The conventional dairy and meat industries lobby state and local*
*governments to halt their rapidly growing plant-based competition.*

56. Tofurky, along with other plant-based meat producers who are members of

PBFA, has benefited from rapidly climbing demand for plant-based foods, experiencing

unprecedented growth in recent years. Sales of plant-based meat alternatives have reliably

grown 11% year after year,[14] and sales in 2020 were up 45% from 2019.[15] It now accounts

for 2.7% of all retail packaged meat sales,[16] and industry experts estimate it will rise to

$6.43 billion by 2023.[17] Animal meat producers increasingly view competition from plant-

based meats as a threat, and apparently see the rising sales of plant-based meat alternatives

as linked to the decreased demand for animal-based dairy products.[18] Market research firms

---

[14] *Fresh Meat and Plant-Based Meat Alternatives on the Rise, According to New Acosta Research*, Acosta, https://www.acosta.com/news/fresh-meat-and-plant-based-meat-alternatives-on-the-rise-according-to-new-acosta-research (last visited Oct. 18, 2021).

[15] U.S. plant-based food retail sales jumped 27% in 2020, Supermarket News (Apr. 6, 2021), https://www.supermarketnews.com/consumer-trends/us-plant-based-food-retail-sales-jumped-27-2020 (last visited Oct. 18, 2021).

[16] *Id.*

[17] Michelle Neff, *Plant-Based Meats Are Taking Over With Market Set to Hit $6.43 Billion by 2023!*, One Green Planet, Feb. 6, 2018, http://www.onegreenplanet.org/news/meat-substitute-market-worth-billions/ (last visited Oct. 18, 2021).

[18] Chuck Jolley, *Six Greatest Ag Challenges for 2018*, Feedstuffs, Dec. 7, 2017, https://bit.ly/30E4mjX (last visited Oct. 18, 2021); *see also* Nat'l Cattlemen's Beef Ass'n, *2018 Policy Priorities*, https://bit.ly/2LrTPF4 (last visited Oct. 18, 2021).

have corroborated this shift away from "traditionally harvested" meat products, as well as the meat industry's corresponding anxiety over its subsequent market share.[19]

57.    As a result, some players in the meat industry have vigorously lobbied legislators and government agencies to take action against their plant-based competitors. In February 2018, the United States Cattlemen's Association petitioned the USDA to prevent plant-based meat alternatives from using the terms "beef" and "meat."[20] When the USDA did nothing, state-level Cattlemen's Associations began lobbying state legislators.

58.    The Missouri state senator who sponsored the first law openly admitted that the bill came from the state's Cattlemen's Association[21]—a "livestock commodity group .

---

[19] *E.g.*, Thea Halpin, *Can Plant-Based Meat Be Better than the Real Thing?*, ABC News, June 16, 2016, http://www.abc.net.au/news/2016-06-17/the-rise-and-rise-of-plant-based-food/7508752 (last visited Oct. 18, 2021); *Watch Out . . . or They Will Steal Your Growth!*! *Why Alternative Proteins Are Competing So Successfully for the Centre of the Plate* Rabobank (Nov. 2017) (asserting that plant-based meats are "stealing" growth from meat products); https://research.rabobank.com/far/en/sectors/animal-protein/why-alternative-proteins-are-competing-for-the-centre-of-the-plate.html (last visited Oct. 18, 2021); *see also* Amanda Radke, *Investment in Lab Meat Takes Off*, Beef (Mag.), Aug. 30, 2017, http://www.beefmagazine.com/outlook/investment-lab-meat-takes (last visited Oct. 18, 2021). Meatingplace, a trade publication covering the meat industry, published 18 articles about plant-based meats and clean meat from September to November 2019.

[20] UNITED STATES CATTLEMEN'S ASSOCIATION PETITION TO USDA, No. FSIS-2018-0016, https://www.fsis.usda.gov/wps/wcm/connect/e4749f95-e79a-4ba5-883b-394c8bdc97a3/18-01-Petition-US-Cattlement-Association020918.pdf?MOD=AJPERES.

[21] Sara Brown, *How Missouri Began to Tackle Fake Meat: Missouri Sen. Sandy Crawford*, Drovers (May 31, 2018), https://www.drovers.com/article/how-missouri-began-tackle-fake-meat-missouri-sen-sandy-crawford (noting that beef cattle represent $2 billion of an $88 billion agriculture industry in Missouri, she added: "That's just the cattle themselves . . . so it is huge for the state of Missouri.").

. . with a primary mission to promote and protect the beef-producing industry."[22] In response to similar pressures from state cattlemen's associations, eleven states have passed protectionist measures to prevent producers of plant-based meat alternatives from using words like "meat," "beef," "sausage," and "roast" to describe plant-based products. Several states, including Missouri,[23] have imposed additional disclaimer language on plant-based meat products' PDPs that differ from the Act.

59.     In Oklahoma, the fifth largest producer of cattle in the United States (as well as the tenth for pig production),[24] the state Cattlemen's Association also took responsibility for the Act,[25] expressly saying that the Association brought the bill to the Oklahoma legislature.[26] When the Act passed, the Cattlemen's Association thanked its partners at the Oklahoma Pork Council.[27]

60.     The lawmakers who sponsored the Act were members of the Oklahoma Cattlemen's Association and stood to gain from the Act—being beef producers

---

[22] MISSOURI CATTLEMEN'S ASS'N, About Us, https://www.mocattle.org/about-us (last visited Nov. 30, 2019).

[23] Via an enforcement memorandum by the Missouri Department of Food & Agriculture, *available at* https://agriculture.mo.gov/animals/pdf/missouri-meat-advertising-guidance.pdf

[24] Beef2Live, Oklahoma Ag Facts, https://beef2live.com/story-oklahoma-ag-facts-116-105007 (last visited July 17, 2021).

[25] Morning AgClips, *Governor Signs Oklahoma Meat Consumer Protection Act*, (May 19, 2020), https://www.morningagclips.com/governor-signs-oklahoma-meat-consumer-protection-act/ (last visited Oct. 1, 2021).

[26] *Id*.

[27] *Id.*

themselves.[28] Clearly proud of protecting animal-based meat producers from the growing competition posed by plant-based meat producers, these lawmakers publicly acknowledged that they are "always willing to help our beef producers . . .,"[29] candidly admitting the true protectionist nature of the Act.

61.     Despite paying lip service to concerns about consumer confusion, it is clear that the State's stated interests are not the actual interests served by the Act. Instead, lawmakers passed the Act to benefit in-state interests by burdening their out-of-state plant-based counterparts.

62.     While some similar laws are on the road to being struck down as unconstitutional restrictions on truthful commercial speech,[30] other states are in the process of passing laws that likewise undermine plant-based meat producers' ability to market and package their products nationwide.

63.     While Oklahoma's Act does not ban speech, it was passed to favor Oklahoma animal-based meat producers over alternative meat producers from other states.

64.     And like the laws at issue in Arkansas, Missouri, and Louisiana, Oklahoma's Act would require Tofurky and other PBFA members to rework marketing and labeling

---

[28] *Id*.

[29] *Id*.

[30] A federal district court in Arkansas determined that the plant-based food company challenging the measures is "likely to prevail on the merits of its First Amendment claim" because these protectionist laws do not directly and materially advance the goal of preventing consumer confusion and they are more extensive than necessary to achieve that stated goal. *Turtle Island Foods SPC v. Soman*, No. 4:19-CV-00514-KGB, 2019 WL 7546141, at *9, 14 (E.D. Ark. Dec. 11, 2019).

nationwide. The Act's restrictions thus reach national labeling (including online communications) that cannot lawfully be regulated by a single state. As it was designed, the Act tilts the playing field markedly in favor of in-state animal-based meat producers and against out-of-state plant-based meat competitors.

### *Oklahoma's Act burdens plant-based meat producers, the free flow of commerce, and impermissibly regulates interstate commerce and extraterritorial conduct.*

65.     Legislators titled Oklahoma's Act the "Meat Consumer Protection Act," apparently citing a need to ensure consumers are not confused by plant-based meat products. Yet there is no evidence consumers need protection, and no support for the State's contention that plant-based meats are misleadingly marketed or labeled. Instead, as seen above, there is ample evidence that lawmakers passed this Act at the behest of animal agriculture special interests.

66.     The Act attempts to impose a significant, additional, and—given current legislative efforts across all 50 states—potentially impracticable disclosure requirement on plant-based meat products' principal display panels.

67.     In doing so, the Act violates the principles of uniform commercial regulation and economic efficiency that are reflected by the dormant Commerce Clause, which prohibits state laws that discriminate against interstate commerce on their face; that harbor a discriminatory purpose; that discriminate in their effect; or that impose a burden on interstate commerce that is clearly excessive in relation to the putative local benefits.

68.     Laws are discriminatory in their effect when they confer a clear competitive advantage to certain in-state companies and create a comparative disadvantage for out of

state companies. Here, the effects of the Act fall disproportionately on out-of-state food manufacturers; all PBFA members are located outside Oklahoma, and, on information and belief, there are no plant-based meat producers located within Oklahoma. As a result, the cost of implementing the Act falls largely, if not entirely, on out-of-state companies, and the Act affects exclusively marketing and labeling actions outside of Oklahoma.

69.     Without limitation and for no stated purpose, Oklahoma's Act prohibits plant-based meat producers' use of meat terminology in marketing and labeling, regardless of where or how those activities take place.

70.     There is no evidence of any local benefit because there is no evidence of any consumer confusion. Yet the burden on Tofurky and other PBFA member-companies is astronomical.

### *Compliance with the Act is impossible because of its vague terms.*

71.     Moreover, the language of the Act is unclear as to what "name of the product" means. The language of the Act is vague as to where producers must display on the "packaging . . . that the product is derived from plant-based sources," as well as what the Act refers to by "the name of the product."[31] However, current federal law already governs the "common or usual name of the product" (a "statement of identity").

### *Effect of the Act on PBFA, Tofurky, and PBFA members*

72.     The PBFA represents many plant-based meat companies that have products sold in Oklahoma. And part of PBFA's express mission is creating a "fair and modern

---

[31] OKLA. STAT. Tit. 2, § 5-107(C)(1).

26

regulatory environment."[32] PBFA's members, like Tofurky, are directly and financially harmed by the Act, and PBFA's organizational objectives and mission to establish a level playing field for plant-based producers are frustrated by the Act, which is why PBFA took steps to combat the Act's passage.

73.     Attempting to comply with the Act would hobble Tofurky and other plant-based meat companies represented by PBFA. The changes seemingly required by the Act would simultaneously (1) cost the company millions of dollars to change labels and marketing representations, and (2) potentially prevent the company from accurately communicating to consumers the nature and contents of its products—what the products taste like, what they're made from, what they do and don't contain, and how to use them.

74.     Absent injunctive and declaratory relief, the Act will continue to burden interstate commerce, threaten companies' ability to deliver their core mission and products to the citizens of Oklahoma, cause untold harm to their business, and expose them to a substantial risk of prosecution. The Act is specifically designed to and will significantly disadvantage plant-based meat producers and PBFA. The Act impedes plant-based meat producers' ability to engage in interstate commerce because of the burden it imposes on the labeling and marketing of plant-based meat products in an effort to protect the economic interests of Oklahoma's meat producers.

75.     Labels for Tofurky's products always include modifiers like "vegan," and "plant-based" that clearly indicate that the products do not contain meat from animals. But

_____

[32] Plant Based Foods Association, Company Membership, https://www.plantbasedfoods.org/join-us/company/ (last visited Oct. 1, 2021).

because it is unclear whether Oklahoma's law requires additional or more prominent disclosures, Tofurky reasonably fears prosecution by the State of Oklahoma.

76.     The Act, if left undisturbed, would also force companies like Tofurky to consider creating one set of labels for Oklahoma and another set for other states, which would raise the cost to come to market. Compliance with the State's interpretation of the Act would therefore have a severe detrimental impact on Tofurky's nationwide marketing and packaging of its products.

77.     Since 1980, Tofurky has invested significant time and expense in developing its products and marketing and packaging those products in truthful and non-deceptive ways. Yet, because of the Act, Tofurky must now either: (1) choose to continue to have its products sold in Oklahoma as packaged, at a substantial risk of prosecution; (2) design, produce, and distribute different, specialized marketing and packaging for its products when they will be sold in Oklahoma, creating a logistical nightmare in distribution channels that service neighboring states, or (3) change the entirety of its marketing and packaging nationwide because of the Act, at considerable expense, and causing confusion to its consumers. The third and last option may not even be possible if other states pass similar laws to Oklahoma's. Further, changing labels in an attempt to comply with the Act may force Tofurky to sacrifice invaluable front-of-package space, or constrain the ways in which Tofurky conveys to consumers the nature and contents of its products.

78.     Each of these options would put Tofurky at a significant commercial disadvantage for no legitimate reason in that they require Tofurky to incur costs and begin labeling its products away from a manner that consumers already understand.

79.     As a result of the Act, Tofurky is likely to experience other serious harms. For example, retail chains that operate in Oklahoma and other states may be less likely to carry plant-based meat products, including those produced and sold by Tofurky, if they cannot do so in the same manner in all their stores. Tofurky also risks liability for advertising in other states that spills over into Oklahoma markets (including regional and national advertising that reaches Oklahoma consumers through print, television, radio, and the internet). And compliance with the Act could create bad will for Tofurky—as customers become frustrated with the unavailability of plant-based meat products in Oklahoma.

80.     These serious harms—in conjunction with the added expense that the Act seeks to impose by forcing Tofurky to specifically tailor its product labels for distribution in Oklahoma—demonstrate that the burden on interstate commerce is unjustifiably excessive when weighed against the Act's illusory, unproven need to prevent alleged consumer confusion.

81.     Finally, complying with Oklahoma's Act may prevent Tofurky and other PBFA member-companies from being able to comply with federal law. And if Oklahoma and other states are allowed to promulgate differing front-of-package standards, it may become not just impracticable but impossible for plant-based meat companies to comply with the patchwork of labeling laws. In short—Oklahoma's Act, along with other states' new laws, may prevent these companies from doing business at all.

82.     Notably, neither the FDA, the FTC, the Oklahoma state Attorney General's office, or any consumer-led lawsuits have ever opted to take enforcement action against a

plant-based meat product out of concern for consumer confusion.

83.     The obvious inconsistencies—between the State's justification for the Act, on the one hand, and the text, purpose, and past enforcement history of the cited state and federal laws and regulations, on the other hand—strongly suggest that the Act is motivated by a desire to favor Oklahoma animal-based meat producers over alternative meat producers from other states rather than by a good-faith effort to enforce existing law or prevent actual consumer confusion.

## CLAIMS FOR RELIEF

### Count One
### (Preemption under federal law)

84.     All foregoing paragraphs are incorporated into Count One for all purposes.

85.     The federal Food, Drug and Cosmetic Act expressly preempts the Act's disclosure requirements. The Act imposes disclosure requirements as a part of products' names that are different from, or in addition to, federal regulations governing statements of identity.

86.     The Act frustrates Congress's intent to create a uniform labeling scheme so that the food industry can market and label products efficiently in all 50 States in a cost-effective manner.

87.     Instead, the Act would create and contribute to a patchwork of separate and potentially conflicting labeling requirements for plant-based meat products from different states and impairs plant-based meat producers' ability to comply with state and federal labeling requirements.

88.     In short, the Act conflicts with, is expressly preempted by, and otherwise impedes the accomplishment and execution of the full purposes and objectives of federal law.

## Count Two
## Violation of the Supremacy Clause

89.     All foregoing paragraphs are incorporated into Count Two for all purposes.

90.     The Act represents an impermissible effort by Oklahoma to establish its own food labeling scheme and to directly regulate the labeling of plant-based meat products. In particular, the Act conflicts with and is expressly preempted by certain provisions of the federal Food, Drug and Cosmetic Act. It impedes the accomplishment and execution of the full purposes and objectives of federal law. As such, the Act violates the Supremacy Clause and is invalid.

## Count Three
## Discrimination in Violation of the dormant Commerce Clause
## 42 U.S.C. § 1983

91.     All foregoing paragraphs are incorporated into Count Three for all purposes.

92.     The Act violates the Commerce Clause of the United States Constitution by discriminating against out-of-state producers of meat products.

93.     The Act violates the Commerce Clause because its purpose and effect are to protect in-state Oklahoma animal-based meat producers from out-of-state competitors who produce plant-based meats.

94.     The Act's disclosure requirement confers a benefit on in-state meat producers by requiring burdensome and expensive disclosure requirements and necessary

changes to marketing and labeling for only out-of-state plant-based meat producers.

95.     The intended and inevitable effect of the Act is to protect in-state meat producers either by preventing plant-based meat producers from selling products within Oklahoma or accepting burdensome and costly Oklahoma-specific disclosures and subsequent marketing and labeling changes.

96.     The Act operates as an impermissible protectionist trade barrier, blocking the flow of goods in interstate commerce unless out-of-state producers comply with the requirements set forth by the Act. The Act's disclosure requirement imposes significant burdens on, and interferes with the conduct of interstate commerce for, Tofurky and PBFA's numerous member companies who produce plant-based meats.

97.     Oklahoma's Act is further discriminatory because it tilts the playing field and consumer access to meat products markedly in favor of in-state meat producers.

98.     The Act violates the Commerce Clause because the State cannot carry its burden of demonstrating, under rigorous scrutiny, that it has no other means to advance a legitimate local interest. Further, Oklahoma has no legitimate local interest in protecting consumers from being confused by plant-based meat products' marketing and labeling because consumers are not confused by current practices. No empirical evidence exists to support a presumption that consumers are confused by the marketing and labeling of plant-based meat products, let alone evidence of a link between additional or different disclosure requirements and the prevention of consumer confusion.

99.     Moreover, there are already federal regulations in place to ensure product names are truthful and not misleading and that consumers are not confused by products'

front-of-package labeling. The FDCA requires plant-based meat producers, and all producers of foods regulated by the FDA, to include statements of identity in certain place and prominence on products' Principal Display Panels. As stated above, the FDCA establishes a uniform regulatory scheme for certain aspects of food labeling. This federal law already fully addresses any concerns the state of Oklahoma might have at preventing labeling practices that encourage consumer confusion.

**Count Four**
**Excessive Burden in Violation of the Dormant Commerce Clause**
**42 U.S.C. § 1983**

100.    All foregoing paragraphs are incorporated into Count Four for all purposes.

101.    The Act violates the dormant Commerce Clause by imposing unreasonable burdens on interstate and foreign commerce that are clearly excessive in relation to any legitimate local benefits.

102.    The Act substantially burdens the interstate and international sale of plant-based meat products. Compliance with the Act would require extensive and costly changes to plant-based meat products' marketing and labeling practices.

103.    PBFA's members, including Tofurky, will be required to make significant changes to their marketing and packaging in order to attempt to comply with the Act—at great cost. The Act will cost the plant-based meat industry millions of dollars in changed marketing and packaging alone and may cost even more in terms of lost market access and decreased sales. What's more, the Act may cause selling plant-based meat products cost-prohibitive nationwide and may prevent fledgling companies from reaching financial solvency.

104.    If companies like Tofurky and other PBFA members were able to comply with the Act, they would likely need to increase the cost of their products—passing the cost on to consumers and limiting consumer access and choice. If companies choose not to comply with the law, they will lose access to the Oklahoma market and consumers will not be able to purchase plant-based meats within the state.

105.    In short, the Act presents out-of-state producers with a host of unpalatable choices: (1) choose to continue to have products sold in the State of Oklahoma as packaged, at substantial risk of ruinous civil liability; (2) design, produce, and distribute different, specialized marketing and packaging for products destined for Oklahoma, creating a logistical nightmare in distribution channels that service neighboring states or with online retailers that reach Oklahoma consumers; (3) change the entirety of the marketing and packaging nationwide to comply with the Act, at considerable expense; or (4) refrain from marketing or selling products in Oklahoma at all, including in non-Oklahoma media markets and online advertisement that may reach Oklahoma consumers. Regardless of the choice made by Tofurky or other plant-based meat producers, it seems that the practical result of the Act will be fewer plant-based meat companies providing products to fewer consumers, at higher prices. As an Act designed by and passed at the behest of Oklahoma's animal-based meat producers, this is likely the Act's true purpose.

106.    The burdens imposed by the Act clearly exceed any legitimate local benefit; the Act cannot be justified by any valid consumer protection purpose. And Oklahoma has no legitimate local interest in regulating the marketing and labeling of products sold in other states, or in preventing Oklahoma consumers from buying imported products that are

34

produced and labeled in ways that Oklahoma disfavors.

**Count Five**
**Violation of Fourteenth Amendment Due Process Clause**
**42 U.S.C. § 1983**

107.    All foregoing paragraphs are incorporated into Count Five for all purposes.

108.    The Fourteenth Amendment's Due Process Clause prohibits statutes that are unconstitutionally vague.

109.    Both on its face and as applied to Tofurky and PBFA's members, the Act is unconstitutionally vague. For example, it is unclear whether the Act requires a second product name in addition to a product's statement of identity. It is also unclear whether FDA's prominence requirements for standards of identity are sufficient, or if characterizing ingredients are sufficient qualifiers under the Act (*e.g.*, "tempeh bacon"). It is also unclear what is meant by the "product name"—if it is the same or distinct from a product's common or usual name, or "statement of identity."

110.    The Act fails to provide persons of ordinary intelligence a reasonable opportunity to understand when or how their packaging or marketing materials violate the Act.

111.    The vagueness inherent in the Act's terms authorizes or encourages arbitrary and discriminatory enforcement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare the Act unconstitutional, both on its face and as applied to Tofurky and PBFA's members;

B.      Upon motion, grant preliminary injunctive relief preventing the enforcement

of the Act, both on its face and as applied to Tofurky and PBFA's members;

C.      Grant a permanent injunction preventing the enforcement of the Act, both on

its face and as applied to Tofurky and PBFA's members;

D.      Award costs and attorneys' fees under 42 U.S.C. § 1988; and

E.      Grant any other relief that the Court deems just and proper.

Respectfully submitted,

*/s/ Heather L. Hintz*
Thomas G. Wolfe, OBA No. 11576
Heather L. Hintz, OBA No. 14253
PHILLIPS MURRAH P.C.
Corporate Tower, Thirteenth Floor
101 North Robinson Avenue
Oklahoma City, OK  73102
Telephone:  (405) 235-4100
Facsimile:  (405) 235-4133
Email:  tgwolfe@phillipsmurrah.com
          hlhintz@phillipsmurrah.com

and

Amanda Howell (admitted *pro hac vice*)
Texas Bar 24078695
Cristina Kladis (admitted *pro hac vice*)
California Bar 332812
ANIMAL LEGAL DEFENSE FUND
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533
*ahowell@aldf.org*
*ckladis@aldf.org*

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of November, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Adam C. Doverspike - adoverspike@gablelaw.com
***Attorney for Plaintiffs***

Randall J. Yates – Randall.Yates@oag.ok.gov
Andy Ferguson – andy.ferguson@oag.ok.gov
***Attorneys for Defendants***

/s/ *Heather L. Hintz*
Heather L. Hintz