## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PLANT BASED FOODS ASSOCIATION and TURTLE ISLAND FOODS SPC d/b/a THE TOFURKY COMPANY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -vs- | ) ) | Case No. CIV-20-938-F |
| KEVIN STITT, in his official capacity as Oklahoma Governor; and BLAYNE ARTHUR, in her official capacity as Oklahoma Commissioner of Agriculture, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

This matter comes before the court upon the parties' cross-motions for summary judgment pursuant to Rule 56, Fed. R. Civ. P.  Doc. nos. 141 and 173. Upon due consideration of the parties' submissions, the court makes its determination.

### I.

### *Background*

Plaintiff Plant Based Foods Association (PBFA),[1] along with Upton's Naturals Co., commenced this action challenging the Oklahoma Meat Consumer

---

[1] PBFA is a nonprofit trade association that represents manufacturers and sellers of 100% plant-based foods.  Plant-based "meats" are foods that approximate the texture, flavor, and appearance of meat from animals.  They are typically made from soy, tempeh, wheat, jackfruit, textured vegetable protein, or other vegan ingredients.

Protection Act (Act), specifically, 2 O.S. § 5-107(C)(1), as unconstitutional under the First and Fourteenth Amendments to the United States Constitution.  The Act was passed during the 2020 Legislative Session as part of House Bill 3806.  Defendant Governor Kevin Stitt signed the Act into law.  At the time this action was commenced, the Act was not yet effective.  The Act became effective on November 1, 2020.  To date, the Act has not been enforced.

The Act provides in pertinent part:

C. Pursuant to the Oklahoma Meat Consumer Protection Act, *no person advertising, offering for sale or selling meat* shall engage in any misleading or deceptive practices, including, but not limited to the following:

1. Misrepresenting the cut, grade, brand, trade name or weight or measure of any meat, or *mispresenting a product as meat that is not derived from harvested production livestock; provided, product packaging for plant-based items shall not be considered in violation of the provisions of this paragraph so long as the packaging displays that the product is derived from plant-based sources in type that is uniform in size and prominence to the name of the product*[.]

2 O.S. § 5-107(C)(1) (emphasis added).[2]

Meat is defined by the Act as "any edible portion of livestock or part thereof," and livestock is defined as "animals defined by paragraph 9 of Section 1-3 of Title 2 of the Oklahoma Statutes."  2 O.S. § 5-107(B)(1) and (2).  Animals are defined as "any cattle, bison, horses, sheep, goats, asses, mules, swine, domesticated rabbits, and chickens, turkeys, and other domesticated fowl, and any animal or bird in captivity."  2 O.S. § 1-3(9).

---

[2] A 2019 predecessor to the Act provided that "[n]o person advertising, offering for sale or selling all or part of a carcass or food plan" shall "misrepresent[] a product as meat that is not derived from harvested production livestock or poultry, provided product packaging for plant-based items shall not be considered to be in violation of the provisions of this paragraph so long as the packaging displays that the product is derived from plant-based sources[.]"  63 O.S. § 317(7) (2019).

The plaintiffs' complaint sought declaratory and injunctive relief against defendants Governor Kevin Stitt and Commissioner of Agriculture Blayne Arthur, in their respective official capacities, under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 1983. On the same day the complaint was filed, the plaintiffs sought a preliminary injunction enjoining defendants and their agents from enforcing the Act. The court, after considering briefing and conducting a hearing, denied the motion. The plaintiffs appealed the ruling to the Tenth Circuit, but later voluntarily dismissed the appeal.

Subsequently, the plaintiffs sought leave to file an amended complaint for declaratory and injunctive relief and to substitute Turtle Island Foods d/b/a the Tofurky Company (Tofurky)[3] for Upton's Naturals Co. as party-plaintiff. The court granted the motion. The amended complaint removed the claims under the First and Fourteenth Amendments and added five new claims to support declaratory and injunctive relief, specifically, preemption under federal law (Count One), violation of the Supremacy Clause (Count Two), discrimination in violation of the dormant Commerce Clause (Count Three), excessive burden in violation of the dormant Commerce Clause (Count Four), and violation of the Due Process Clause of the Fourteenth Amendment (Count Five).

After answering the amended complaint and engaging in discovery, defendants moved for an order of dismissal of PBFA as party-plaintiff for lack of Article III standing. The court denied the motion. The court determined it was not necessary to address the issue of PBFA's standing because defendants had not challenged Tofurky's standing, and Tofurky raised the same claims and sought the same declaratory and injunctive relief as PBFA. Assuming the truth of the

---

[3] Tofurky develops, produces, markets, and sells 100% plant-based meat products, including vegan burgers, meat slices, and sausages in various flavors.

allegations in the amended complaint, the court determined that those allegations satisfied the prerequisites to standing, enabling Tofurky to bring suit.

Thereafter, defendants filed their summary judgment motion challenging the merits of plaintiffs' claims. Plaintiffs responded in opposition and moved for summary judgment in their favor on their claims. In their filing, plaintiffs argued they have Article III standing to bring their claims. PBFA asserted that it had standing to challenge the Act on its own behalf and on behalf of its members, and Tofurky contended that it had standing to sue on its own behalf. Defendants denied that either PBFA or Tofurky had Article III standing.

After cursory review of the parties' filings, the court directed the filing of supplemental briefs. It was noteworthy to the court that "[b]y the plain terms of the statute, the prohibition" set forth in the Act --- "a product cannot be represented as meat if it 'is not derived from harvested production livestock'" --- "applies only to persons 'advertising, offering for sale or selling meat.'" Doc. no. 190, pp. 1-2 (quoting doc. no. 123). In the court's view, "there may be a serious question as to whether plaintiffs are really exposed to the kind of concrete harm they complain about (and, under Article III, must show) in this case." *Id*. The court concluded that the issue of whether the Act applies to plaintiffs needed to be addressed. In addition, the court concluded that the traceability and redressability requirements of Article III standing needed to be addressed. The parties complied with the court's directive.

For the reasons stated at length in this order, the court concludes that plaintiffs, as the parties asserting federal jurisdiction, have not established the elements of Article III standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the Article III standing] elements."). The court concludes that it must deny plaintiffs' summary judgment motion to the extent it seeks an adjudication that plaintiffs have Article III standing. The court concludes that it must dismiss plaintiffs' action against

defendants without prejudice, pursuant to Rule 12(h)(3), Fed. R. Civ. P., for lack of subject matter jurisdiction due to plaintiffs' lack of standing.

II.

*Analysis*

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2; *see also*, Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 (2014). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013) (internal citations and quotation marks omitted).

To establish Article III standing, a plaintiff must demonstrate three elements: (1) an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury is likely, as opposed to merely speculative, to be redressed by a favorable decision. Lujan, 504 U.S. 560-61. "To satisfy the first of these three elements, a plaintiff must offer something more than the hypothetical possibility of injury." Colorado Outfitters Ass'n v. Hickenlooper, 823 F.3d 537, 544 (10th Cir. 2016). "The alleged injury must be concrete, particularized, and actual or imminent." *Id*. (citing Lujan, 504 U.S. at 560). "For an injury to be particularized, it 'must affect the plaintiff in a personal and individual way.'" Laufer v. Looper, 22 F.4th 871, 876 (10th Cir. 2022) (quoting Lujan, 504 U.S. at 560 n. 1). "To be concrete, an injury must be real rather than abstract." *Id*. (internal quotation marks and citation omitted). "An alleged future injury is sufficiently imminent if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Id*. (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014)).

Article III standing is determined as of the time the action is brought. *See*, Nova Health Systems v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005).

Standing of PBFA – On Its Own Behalf

PBFA contends that it has standing to challenge the Act "on its own behalf and on behalf of its members." Doc. no. 174, ECF p. 16. Under the Supreme Court's precedents, "organizations may have standing 'to sue on their own behalf for injuries they have sustained.'" Food and Drug Administration v. Alliance for Hippocratic Medicine, 602 U.S. ___, 2024 WL 2964140, at *13 (June 13, 2024) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 279, n. 19 (1982)). "In doing so, however, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." Id.

"[A]n organization may not establish standing simply based on the intensity of the [organization's] interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization." Alliance for Hippocratic Medicine, 2024 WL 2964140, at *13 (citations and internal quotation marks omitted). "A plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" Id. (quoting Havens, 455 U.S. at 379). Thus, PBFA cannot assert standing simply because it objects to the Act. Id.

PBFA contends that it has suffered a concrete injury because it "has had to divert and expend organizational resources to combat the harms the Act is causing PBFA and its members." Doc. no. 174, ECF p. 16. As evidence of this injury, PBFA relies upon the declaration of its Chief Executive Officer, Rachel Dreskin. Doc. no. 122-1, specifically, ¶¶ 13-19. In her declaration, Ms. Dreskin avers that PBFA was forced to expend organizational resources to lobby against the Act and to address the Act once it was enacted. It also had to expend its resources educating its members about the Act, conducting research on the effects of the Act, and determining the repercussions of the Act and how to combat them. According to Ms. Dreskin, PBFA submitted requests to state legislators to vote against the

legislation and requested Governor Kevin Stitt to veto it. PBFA has communicated with its members who sell products in Oklahoma and held meetings with them to determine how the law could impact their ability to sell. In addition, it has engaged in several efforts to help educate its members and the public about the negative ramifications of the law. *Id*.

However, in Alliance for Hippocratic Medicine, the Supreme Court stated that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." 2024 WL 2964140, at *13. "An organization cannot manufacture its own standing in that way." *Id*.

Like the medical associations in Alliance for Hippocratic Medicine, PBFA relies on the Supreme Court's decision in Havens Realty Corp. v. Coleman for standing based on the diversion of resources theory. But the Supreme Court rejected that theory. According to the Court, "that theory would mean that all the organizations in America would have standing to challenge almost every federal [or in this case, state] policy they dislike, provided they spend a single dollar opposing those policies." 2024 WL 2964140, at *13. The Court concluded that Havens did "not support such an expansive theory of standing." *Id*.

In its papers, PBFA also asserts that it has suffered concrete injury because the Act "frustrates PBFA's ability to accomplish its mission." Doc. no. 191 (citing doc. no. 122, pp. 4-7). In her declaration, Ms. Dreskin avers that the Act frustrates PBFA's "explicit goal of promoting clarity and consistency in the labeling of plant-based foods and ensuring not only that there remains a uniform nationwide labeling scheme, but that such scheme is evenhandedly enforced." Doc. no. 122-1, ¶ 17. In support of its frustration of mission theory, PFBA again relies on the Havens decision. Although the Supreme Court did not address the frustration of mission theory, the court is far from convinced that PFBA's reliance on that theory is

sufficient to establish an injury in fact for standing purposes. As the Supreme Court stated: "<u>Havens</u> was an unusual case, and this Court has been careful not to extend the <u>Havens</u> holding beyond its context." <u>Alliance for Hippocratic Medicine</u>, 2024 WL 2964140, at *14. PBFA has not presented evidence of the kind of injury that the <u>Havens</u> plaintiff incurred. It has not shown, from the cited paragraphs of Ms. Dreskin's declaration, that defendants' actions "directly affected and interfered with [its] core business activities[.]" <i>Id</i>. at *13.

Upon review, the court concludes that PBFA has failed to set forth by affidavit or other evidence "specific facts," that if taken as true, show a concrete injury on its own behalf. <i>See</i>, <u>Clapper</u>, 568 U.S. at 412; <u>Lujan</u>, 504 U.S. at 561.

<u>Standing of PBFA - On Behalf Of Its Members</u>

An organization "can assert 'standing solely as the representative of its members.'" <u>Students for Fair Admissions, Inc. v. President and Fellows of Harvard College</u>, 600 U.S. 181, 199 (2023) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 511 (1975)). "To invoke it, an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" <i>Id.</i> (quoting <u>Hunt v. Washington State Apple Advertising Comm'n</u>, 432 U.S. 333, 343 (1977)).

A threshold issue is whether PBFA's members who market and sell 100% plant-based meat products would otherwise have standing to sue in their own right. One of those members is Tofurky. According to PBFA, Tofurky and its other plant-based meat producing members "fear prosecution under the Act, both from the sale of their products in Oklahoma and from their online marketing, which may be accessed by Oklahoma consumers." Doc. no. 174, ECF p. 16.

In their summary judgment motion, plaintiffs stated the penalties for violation of the Act are those found in 2 O.S. § 5-106. Doc. no. 174, ECF p. 12, ¶ 15. That statement was undisputed by defendants. Doc. no. 182, ECF p. 8, ¶ 7. Section 5-106 provides for both misdemeanor-level criminal punishment and significantly more serious felony-level punishment—a fine not to exceed $10,000 or imprisonment for a term not to exceed three years (or both). *See*, 2 O.S. § 5-106.[4]

A. Injury in Fact

To establish an injury in the context of a pre-enforcement challenge to a criminal statute, "a plaintiff must typically demonstrate (1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged] statute,' and (2) that 'there exists a credible threat of prosecution thereunder.'" Colorado Outfitters, 823 F.3d at 545 (quoting Driehaus, 573 U.S. at 159) (other quotation omitted). "The threat of prosecution is generally credible where a challenged provision on its face proscribes the conduct in which a plaintiff wishes to engage, and the state has not disavowed any intention of invoking the provision against the plaintiff." Frank v. Lee, 84 F.4th 1119, 1133 (10th Cir. 2023) (quotation marks, citations and ellipsis omitted).

Upon review, the court concludes that PBFA has failed to sufficiently demonstrate that the course of conduct its members who produce, market, and sell 100% plant-based meat products intend to engage in is "arguably proscribed by [the

---

[4] At the preliminary injunction stage, plaintiffs, represented by other counsel, asserted that the penalties in 2 O.S. § 2-18 applied. *See*, § 2-18(A) (authorizing the assessment of an administrative penalty of not less than $100 and not more than $10,000 for each violation of the Oklahoma Agricultural Code) and § 2-18(C) (providing that a person who fails to comply with the provisions of the Oklahoma Agricultural Code shall be deemed guilty of a misdemeanor unless a violation of the Oklahoma Agricultural Code is specifically identified with a penalty or as a felony in the individual articles of the Oklahoma Agricultural Code). *See*, doc. no. 6, ECF p. 15 and n. 5. In their supplemental briefing, plaintiffs suggest the penalties are unspecified. Doc. no. 191, ECF p. 16. The court analyzes the issue of Article III standing based on plaintiffs' statement in their summary judgment motion.

challenged] statute," <u>Driehaus</u>, 573 U.S. at 162, and that a credible threat of prosecution exists.

By its plain terms, the Act applies only to those who sell (or advertise or offer for sale) "meat" defined as an "edible portion of livestock or part thereof." This includes retailers which sell both real meat and plant-based meat products. The statutory prohibition involved in this case applies to their marketing and selling of plant-based meat products. The prohibition does not apply to sellers dealing only in plant-based meat products, because it includes only sellers of "meat," as defined.

The parties are united (albeit not for identical reasons) in opposing this conclusion as to the plain import of the statute. What plaintiffs want the court to do is judicially amend the statute, and then declare it unenforceable as judicially amended. Defendants, for their part, want the court to judicially amend the statute, and then bestow the court's blessing on the judicially amended version. The court declines to take either course.

The parties' submissions as to what the statute really means are supported by some familiar canons of construction. Plaintiffs argue, citing respectable Oklahoma[5] authority, that the manifest intent of the legislature should prevail over the literal import of the words of the statute. *See*, doc. no. 191, ECF p. 4. In the same vein, they argue that incorrect or inept choice of words in a statute will not be construed in a manner which would destroy the real and obvious purpose of the statute. *Id.* Similarly, defendants rely on Oklahoma authority for the proposition that a statutory construction that would lead to absurdity must be avoided and a rational construction should be given to a statute *if the language fairly permits*. *See*, doc. no. 192, ECF p. 9 (citing <u>McIntosh v. Watkins</u>, 441 P.3d 1094, 1096 (Okla. 2019)). To the same

---

[5] Plaintiffs point out, correctly, that a when a federal court construes a state statute, that state's rules of construction should be used. <u>Phelps v. Hamilton</u>, 59 F.3d 1058, 1071 (10th Cir. 1995).

effect, *see*, LeFlore v. Reflections of Tulsa, Inc., 708 P.2d 1068, 1075 (Okla. 1985), and City of Norman v. Liddell, 596 P.2d 879, 882 (Okla. 1979).

These arguments are appealing as far as they go. The evident twin purposes of the statute are (i) to facilitate informed consumer choices by reducing the likelihood that a busy shopper, hurrying through the meat section of the grocery store, will reach for a package containing a plant-based product, thinking that it contains real meat,[6] and, in consequence, (ii) to protect livestock producers from the effects of ill-informed point-of-sale selections by consumers. But *construing* a statute to give it a sensible meaning within the outer limits of the words that are there is one thing. Judicially *amending* a statute to give it a meaning–however sensible–directly contrary to the meaning conveyed by the words used by the legislature is quite another. This is where the "if the language fairly permits" concept takes over. "[O]nly when the statutory language permits, may we adopt a construction intended to avoid hardship or evils intended to be prevented." Keating v. Edmondson, 37 P.3d 882, 888 (Okla. 2001). For instance, the Supreme Court of Oklahoma has recently refused to substitute "must" for "may." Toch, LLC v. City of Tulsa, 474 P.3d 859, 868 (Okla. 2020), *as corrected* (Sept. 30, 2020) (citing Ledbetter v. Okla. Alcoholic Beverage Laws Enforcement Comm'n, 764 P.2d 172, 179 (Okla. 1988) for the rule that "[s]tatutory construction that would lead to an absurdity must be

---

[6] The understandable basis for this legislative concern is epitomized by the Upton's Naturals Co.'s label that was before the court at the preliminary injunction stage of this case. The product was prominently labeled "Ch'eesy Bacon Mac" even though it contained no bacon (or, for that matter, cheese). On the label for this product, the descriptive product name and a depiction of what would appear to be macaroni and cheese garnished with bacon were far more conspicuous than the word "vegan." *See*, Upton's Naturals Co. v. Stitt, No. CIV-20-938-F, 2020 WL 6808784, at *1 (W.D. Okla. Nov. 19, 2020).

avoided and a rational construction should be given to a statute if the language fairly permits.").[7]

These limitations on judicial repair work are far from unique to Oklahoma. As Justice Scalia has written:  "Words do have a limited range of meaning, and no interpretation that goes beyond that range is permissible."  Antonin Scalia, *A Matter of Interpretation*, 24 (Princeton: Princeton U. Press, 1997).  Another essayist in the same work put it this way:  "The text, however, remains the alpha and omega of interpretation.  It serves both as the starting point for judicial reasoning and the outer limit on the range of possible results."  Mary Ann Glendon, Comment, *ibid.* at 106-07.

Bearing these limitations in mind, what the court declines to do is import into the statute words that are plainly not there, and then adjudicate the meaning and enforceability of the statute as judicially amended.  To give the statute the meaning contended for by the parties, the court would have to do more than a little rewriting of the statute.  The first step would be to rewrite the definition of "meat" in subsection (B)(2) to include plant-based meat products.  That would give the word "meat," as used in the introductory portion of § 5-107(C) the inclusive meaning contended for by the parties (*e.g.*, "no person . . . selling meat shall . . . .").  But then the court would have to rewrite the definition of meat for purposes of subdivision (C)(1) to include only "meat" derived from production livestock.  The short of the matter is that if repair work is necessary–which seems likely–that task falls to the Oklahoma legislature, following which a court of competent jurisdiction can, if called upon to do so, pass judgment on the repaired version.

---

[7] Ledbetter was cited to this effect as recently as March 12 of this year.  Schiewe v. Cessna Aircraft Co., 546 P.3d 234, 243 (Okla. 2024).

Because the prohibition at issue here does not apply to sellers dealing only in plant-based meat products, the court concludes that PBFA has failed to demonstrate that the course of conduct its members who produce and sell 100% plant-based meat products intend to engage in is arguably proscribed by the challenged statute and that a credible threat of prosecution exists.  Thus, the court concludes that PBFA has failed to demonstrate an injury in fact in support of its pre-enforcement challenge of the Act.[8]

In supplemental briefing, PBFA asserts that some of its members advertise, offer for sale, or sell "meat" as defined by the Act.  PBFA submits the affidavit of Ms. Dreskin to establish that the association represents one member, specifically, Palacios.US, that advertises, offers for sale and sells both animal-based and plant-based meat products.  According to Ms. Dreskin, Palacios.US's packaging for the "Plant Based BBQ Chorizo" and "Plant Based Burger" is arguably proscribed by the Act because it does not show that the product is derived from plant-based sources in type that is uniform in size and prominence to the name of the product.

The court, however, concludes that PBFA cannot rely upon Palacios.US to establish standing.  Ms. Dreskin's declaration contains inadmissible hearsay.  *See*, Rule 801(c), Fed. R. Evid.  PBFA does not proffer a hearsay exception which would make this hearsay admissible at trial.  In addition, Ms. Dreskin's declaration does not indicate that the information she provides is based on her personal knowledge.  *See*, Rule 56(c)(4), Fed. R. Civ. P. (a declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."); Rule 602, Fed. R. Evid.

---

[8] Even if the prohibition of the Act on its face applied to Tofurky and PBFA's members who only produce, market, and sell 100% plant-based meat products, PBFA still has not shown a credible threat of prosecution.  Although Oklahoma has not disavowed invoking the Act against those who only produce, market, and sell 100% plant-based meat products, the record submitted by plaintiffs indicates that enforcement of the Act is uncertain until rule-making occurs.  Doc. no. 174-4, ECF p. 27, ll. 3-10, ECF p. 28, ll. 15-24.

(requiring a testifying witness to "ha[ve] personal knowledge of the matter."). Under the personal knowledge standard, a declaration "is inadmissible if the witness could not have actually perceived or observed that which [she] testifies to." Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d 1193, 1200 (10th Cir. 2006) (quotation marks and citation omitted). The record does not show whether Ms. Dreskin could have "actually perceived or observed" the information provided in her declaration.

The court recognizes that "[a]t the summary judgment stage, evidence need not be submitted in a form that would be admissible at trial." Argo, 452 F.3d at 1199 (quotation marks and citation omitted). Nonetheless, "the content or substance of the evidence must be admissible." Id. (quotation marks and citation omitted). The content or substance of the information in Ms. Dreskin's declaration would not be admissible at trial because plaintiffs did not identify Palacios.US or any of its officers or employees during discovery or in their amended witness list. The court raised the issue regarding whether the prohibition of the Act applied to plant-based only producers and sellers prior to plaintiffs filing their amended witness list. Plaintiffs had ample opportunity to include an employee or officer from Palacios.US on that list and to identify the company or its officers and employees to defendants during discovery. In the court's view, defendants would be unduly and unfairly prejudiced by the addition of Palacios.US at this late date. Thus, the court rejects PBFA's argument that it has standing to challenge the constitutionality of the Act on behalf of its member, Palacios.US.

PBFA posits, in a footnote in their supplemental briefing, that "regardless of whether the Act can be used to prosecute PBFA's members directly, those members can be charged for aiding and abetting violations of the Act[,]" relying upon 21 O.S. § 172. See, doc. no. 191, n. 4. It points out that its members disseminate their products to retailers and distributors that sell both plant-based and livestock-based

products in Oklahoma.   Consequently, PBFA asserts that a credible fear of prosecution exists because the Act can arguably be applied to prosecute its members for aiding and abetting any violations.  The court disagrees.

"[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs."  Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979).  "When plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court."  Id. at 299-300.  In this case, PBFA has not proffered evidence, by declaration or otherwise, setting forth specific facts indicating that prosecution is likely or even that it is remotely possible against Tofurky or other 100% plant-based meat producers and sellers for violations of the Act as aider and abettors.  The court concludes that any fears of prosecution for aiding and abetting are imaginary and speculative.

In addition, PBFA, in its supplemental briefing, contends that it may pursue the pre-enforcement challenge of the Act because Tofurky and other PBFA members' businesses will suffer economic harm.  Although its members have not changed their marketing or packaging, PBFA asserts that the Act will impose costs on its members.  These costs include redesigning their labels and creating new packaging, loss of distribution partners due to non-compliant labels, and the development of a new marketing scheme.  However, because the Act does not arguably apply to the conduct of Tofurky or the other 100% plant-based meat members, PBFA cannot demonstrate that the alleged threatened injury is certainly impending or that there is a substantial risk the injury will occur.  See, Laufer, 22 F.4th at 876.

Lastly, in its supplemental briefing, PBFA asserts that Tofurky and its other members have injury in fact attributable to the Act based on contingent liability to

retailers and distributors.  PBFA proffers a declaration of Jaime Athos, Tofurky's President and Chief Executive Officer, to support the assertion.  Doc. no. 191-2, ¶¶ 5-6.  Mr. Athos avers that Tofurky has indemnification clauses in its distribution and sales agreements which require Tofurky to indemnify distributors and their affiliates for violations of law regarding labeling, packaging, sales, and advertising and promotional materials created by Tofurky.  In addition, he avers that Tofurky has no control over the states its products will end up in because the distributors determine where the products are ultimately sold.

Initially, it is not clear whether the indemnification clauses discussed by Mr. Athos would cover possible criminal convictions and fines set forth in § 5-106. Nevertheless, the court concludes that PBFA has not sufficiently demonstrated an injury in fact based on contingent liability.

As support for its theory, PBFA relies upon Protocols, LLC v. Leavitt, 549 F.3d 1294 (10th Cir. 2008).  There, the Tenth Circuit determined that a contingent liability may present an injury in fact for standing purposes:

> [C]ourts—including the Supreme Court, both explicitly and implicitly—have recognized that contingent liability may present an injury in fact.  To be sure, an injury in fact must be "actual or imminent," and a contingent liability, by definition, may not arise for a considerable time, if ever.  The consequences of a contingent liability, however, may well be actual or imminent.

Id. at 1299.  The Tenth Circuit found that the plaintiffs had suffered an actual and imminent injury because they had submitted affidavits to show their "potential [contingent] liability has a present impact on its business[.]"  Id. at 1301.[9]  The affidavits submitted by the plaintiffs in Protocols described the contingent liability

---

[9] The plaintiffs in Protocols assisted in structuring settlement of workers' compensation claims. They alleged the Centers for Medicare and Medicaid Services, an agency within the United States Department of Health and Human Services, misinterpreted the Medicare statute and regulations in a 2005 memorandum, which exposed the plaintiffs to unexpected liabilities arising out of the settlements they structured.

hampering business in three ways: "(1) the company's value decreased because of contingent liabilities; (2) the uncertainty of the liability harm[ed] [the company's] ability to plan how much revenue it may use for capital and operating costs; and (3) the company ha[d] postponed discussions with potential investors while awaiting the outcome of this lawsuit, because potential investors want to know about contingent liabilities." *Id.* at 1299.

Here, Mr. Athos's declaration does not describe any present impact on Tofurky's business due to the contingent liability to distributors and retailers. Unlike the plaintiffs in <u>Protocols</u>, Mr. Athos does not proffer testimony that Tofurky's business is in any way hampered because of the alleged contingent liability. Because PBFA does not present any other evidence besides Mr. Athos's declaration to establish the existence of contingent liability, the court concludes that PBFA has failed to show actual and imminent injury based on its members' alleged contingent liability to distributors and retailers.

In sum, based on the summary judgment record, the court concludes that PFBA has failed to demonstrate an injury in fact to support its Article III standing to proceed on behalf of its members.

B. <u>Causation</u>

Even if PBFA could demonstrate a cognizable injury in fact by Tofurky or other members, the court concludes that PBFA has not established the second element of Article III standing—causation. This element requires a plaintiff's action be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." <u>Lujan</u>, 504 U.S. at 560 (ellipsis and alterations omitted).

"It is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the

complained-of provision." Bronson v. Swensen, 500 F.3d 1099, 1110 (10th Cir. 2007).

Plaintiffs have sued Governor Stitt and Commissioner Arthur to preclude the enforcement of the Act and its criminal penalty provision found at § 5-106.

Several Tenth Circuit cases summarize the framework for determining whether a defendant has the enforcement authority necessary to render that defendant amenable to suit. Kitchen v. Herbert, 755 F.3d 1193, 1201 (10th Cir. 2014) is instructive:

> "Whether the Defendants have enforcement authority is related to whether, under Ex parte Young, they are proper state officials for suit." Cressman v. Thompson, 719 F.3d 1139, 1146 n. 8 (10th Cir. 2013) (citation omitted). Under Ex parte Young, a state defendant sued in his official capacity must "have some connection with the enforcement" of a challenged provision. 209 U.S. 123, 157, 28 S.Ct. 441, 52 L.Ed. 714 (1908). "An officer need not have a special connection to the allegedly unconstitutional statute; rather, he need only have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." Chamber of Commerce of the U.S. v. Edmondson, 594 F.3d 742, 760 (10th Cir. 2010) (quotation omitted); *see also* Finstuen v. Crutcher, 496 F.3d 1139, 1151 (10th Cir. 2007) ("So long as there is [some] connection [with enforcement of the act], it is not necessary that the officer's enforcement duties be noted in the act." (quotation omitted)).

To be sure, the Commissioner, as the leader of the State Department of Agriculture, is certainly not detached from matters relating to enforcement of the Act. It is easy to imagine that, at times, matters relating to the Act are front-of-mind for the Commissioner, if for no other reason than that he is the chief administrative officer of the Department. See, 2 O.S. § 1-3(15). That is not the issue. The issue is whether the Commissioner demonstrably (*e.g.*, as a matter of constitutional or statutory text) has "a particular duty to enforce the statute." He does not. That duty rests, as a matter of statutory law, with the State Board of Agriculture.

The Oklahoma Agricultural Code, where the Act is located, specifically provides that the State Board of Agriculture shall have the power to "[i]nitiate and prosecute . . . criminal actions and proceedings necessary under the Oklahoma Agricultural Code." 2 O.S. § 2-4. It also provides that "[w]hen requested by the State Board of Agriculture it shall be the duty of a district attorney or the Attorney General to institute proceedings in the proper courts in a timely manner and to prosecute in the manner provided by law when violations" of the Oklahoma Agricultural Code occur. 2 O.S. § 2-16(A)(1).

Although Commissioner Arthur is President of the Board, the Board has four other members. 2 O.S. § 2-1(1). And only the Commissioner serves at the pleasure of the Governor. 2 O.S. § 2-3(A). While PBFA contends the Commissioner, as the President of the Board, has power to initiate and prosecute proceedings, including criminal actions and proceedings, *see*, doc. no. 191, ECF p. 14, the plain language of the Oklahoma Agricultural Code provides otherwise. Moreover, PBFA has not cited authority or proffered evidence setting forth specific facts indicating that the Board has delegated any of its enforcement of the Act and its criminal penalty provision to Commissioner Arthur.

The court concludes that PBFA has not shown that Commissioner Arthur has a particular duty to enforce the Act, including its criminal penalty provision. Moreover, the court concludes that PBFA has not demonstrated with specific facts any willingness by Commissioner Arthur to fulfill such a duty. PBFA states, in briefing, that the "enforcing agency, overseen by Commissioner Arthur, has stated it intends to enforce the Act against plant-based companies such as Plaintiffs." Doc. no. 191, ECF p. 14. In support of that statement, PBFA cites the deposition of Scott Yates, doc. no. 174-4, 32:16-22, 33:8-13. The testimony cited, however, does not support that statement.

As to Governor Stitt, PBFA maintains it can establish the causation element relying on the case of <u>Petrella v. Brownback</u>, 697 F.3d 1285, 1293-94 (10th Cir. 2012).  In that case, the Tenth Circuit stated:

> It cannot seriously be disputed that the proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute.  *See* <u>Ex parte Young</u>, 209 U.S. 123, 161, 28 S.Ct. 441, 52 L.Ed. 714 (1908).  Nor can it be disputed that the Governor and Attorney General of the state of Kansas have responsibility for the enforcement of the laws of the state.  *See* Kan. Const. Art. 1 § 3; Kan. Stat. Ann. § 75-702.

<u>Petrella</u> illustrates a noteworthy difference between the government of Oklahoma and the government of Kansas.  Oklahoma, like Kansas, has a constitutional provision vesting "supreme executive power" in the governor.  Okla. Const., Art. VI, § 2.  But the Oklahoma constitution, unlike that of Kansas, does not go on to task the governor with "the enforcement of the laws of this state."  Kan. Const., Art. I, § 3.  That is not an accidental difference.  The framers of the Oklahoma Constitution set out to craft the antithesis of what is nowadays called the "unitary executive."  On that score, the Oklahoma Constitution partakes at least as much of William Jennings Bryan as it does of James Madison.  "Fearing excessive power in the hands of one individual, the framers of the Oklahoma Constitution intentionally created a weak state chief executive."  <u>Ho v. Tulsa Spine & Specialty Hosp., L.L.C.</u>, 507 P.3d 673, 679 (Okla. 2021).  *See also*, <u>United States v. Morgan</u>, 635 F.App'x. 423, 425 n. 2 (10th Cir. 2015) citing testimony asserting (admittedly with some exaggeration) that "in the State of Oklahoma, with a weak governor form of government, the governor can't do anything without the advice and consent of the Senate."

In the court's view, PBFA has not shown that Governor Stitt has a particular duty to enforce the Act and the criminal penalty provision.  Further, PBFA has not

demonstrated with specific facts any willingness by Governor Stitt to exercise that duty.

In sum, PBFA has failed to establish by declaration or other evidence "specific facts," that if taken as true, Lujan, 504 U.S. at 561, demonstrate that Commissioner Arthur and Governor Stitt possess authority to enforce the Act and the criminal penalty provision. Therefore, the court concludes that PBFA has failed to establish the causation element for Article III standing.

C. Redressability

The third element of Article III standing is redressability – a likelihood that the injury in fact will be redressed by a favorable decision. However, this element is not met "when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute." Bronson, 500 F.3d at 1111. Because PBFA has not demonstrated a power to enforce the Act and the criminal penalty provision by Commissioner Arthur and Governor Stitt, the court concludes that PBFA has not satisfied the redressability element of Article III standing.

Based on the summary judgment record, the court finds that PBFA has not demonstrated that "its members would otherwise have standing to sue in their own right." Students for Fair Admissions, Inc., 600 U.S. at 199 (quotation marks and citation omitted). The court consequently concludes that PBFA cannot assert Article III standing on behalf of its members.

Tofurky

As discussed, in an earlier stage of this proceeding, defendants moved to dismiss PBFA for lack of Article III standing. In denying the motion, the court concluded it was not necessary to address the issue of PBFA's standing because Tofurky raised the same claims and sought the same declaratory and injunctive relief as PBFA, and the allegations of the amended pleading, taken as true, established each of the standing elements for Tofurky to bring suit. See, Town of Chester, N.Y.

v. Laroe Estates, Inc., 581 U.S. 433, 439 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint."); *see also*, Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,  547 U.S. 47, 52 n. 2 (2006) (presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement).

However, as the Supreme Court has recognized, "an initial conclusion that plaintiffs have standing is subject to reexamination, particularly if later evidence proves inconsistent with that conclusion."  Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 201 (2000) (Justice Scalia and Justice Thomas dissenting) (citing Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 115 and n. 31 (1979)).

In asserting Article III standing on behalf of its members, PBFA relied on Tofurky's alleged injuries.  PBFA and Tofurky additionally make the same arguments and proffer the same evidence addressing the elements of standing.  For the same reasons as those demonstrating that PBFA has not shown that its members would otherwise have standing to sue in their own right, the court concludes that Tofurky has not demonstrated that it has standing to sue in its own right.

III.

*Conclusion*

Because PFBA and Tofurky, as the parties invoking federal jurisdiction, have not established the elements of Article III standing, the court concludes that PFBA and Tofurky's cross-motion for summary judgment should be denied to the extent it seeks adjudication they have Article III standing and stricken as moot in all other respects, and defendants' motion for summary judgment should be stricken as moot in all respects.  The court concludes that plaintiffs' action against defendants should

22

be dismissed without prejudice, pursuant to Rule 12(h)(3), Fed. R. Civ. P.,[10] for lack of subject matter jurisdiction due to plaintiffs' lack of Article III standing.

IV.

*Ruling*

Accordingly, Plaintiffs' Cross-Motion for Summary Judgment (doc. no. 173) is **DENIED** to the extent it seeks adjudication they have Article III standing and **STRICKEN as MOOT** in all other respects.  Defendants' Motion for Summary Judgment (doc. no. 141) **is STRICKEN as MOOT** in all respects.

The action of plaintiffs Plant Based Foods Association, and Turtle Island Foods SPC d/b/a The Tofurky Company against defendants Kevin Stitt, in his official capacity as Oklahoma Governor, and Blayne Arthur, in her official capacity as Oklahoma Commissioner of Agriculture, is **DISMISSED WITHOUT PREJUDICE** pursuant to Rule 12(h)(3), Fed. R. Civ. P., for lack of subject matter jurisdiction due to plaintiffs' lack of standing.

A separate judgment will be entered.

IT IS SO ORDERED this 24th day of June, 2024.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

20-0938p053 MSJ REV .docx

---

[10] Section 12(h)(3) provides that any time a court determines "that it lacks subject-matter jurisdiction, the court must dismiss the action."  The Tenth Circuit "has repeatedly characterized standing as an element of subject matter jurisdiction."  Hill v. Vanderbilt Capital Advisors, LLC, 702 F.3d 1220, 1224 (10th Cir. 2012).